UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 11-2673(DSD/AJB)

Walsh Bishop Associates, Inc.,

        Plaintiff,

v.                                                **ORDER**

Keith O'Brien, Ian Scott,
David Serrano and WBA Partners, Inc.,

        Defendants.

        Debra L. Weiss, Esq., Mary M.L. O'Brien, Esq. and Meagher
        & Geer, PLLP, 33 South Sixth Street, 4400, Minneapolis,
        MN 55402, counsel for plaintiff.

        George R. Wood, Esq. and Littler Mendelson, PC, 80 South
        Eighth Street, Suite 1300, Minneapolis, MN 55402, counsel
        for defendants.

        This matter is before the court upon the motion to dismiss by defendants Keith O'Brien, Ian Scott and David Serrano. Based on a review of the file, record and proceedings herein, and for the following reasons, the motion is granted and this action is dismissed with leave to file in state court.

**BACKGROUND**

        This dispute arises out of the employment of defendants by plaintiff Walsh Bishop Associates, Inc. (Walsh Bishop). Walsh Bishop is an architectural firm located in Minneapolis, Minnesota. It serves clients in Minnesota and nationwide, and its name is known locally, nationally and internationally. Compl. ¶ 3. O'Brien was the account manager for Walsh Bishop's entertainment

and hospitality group.  Id. ¶ 4.  Scott was a design principal. Id. ¶ 5.  Serrano was an architect.  Id. ¶ 6.  All three were officers of Walsh Bishop, served on the executive committee and held themselves out as vice presidents and principals of Walsh Bishop.  Id. ¶¶ 4-6.  Walsh Bishop gave each "access to the highest level of confidential and proprietary information of [Walsh Bishop]."  Id. ¶ 15.  All of the events alleged in this action occurred while defendants were employees of Walsh Bishop.

In June 2011, O'Brien, Scott and Serrano incorporated defendant WBA Partners, Inc. (WBA Partners) Id. ¶ 7.  Thereafter, defendants used the WBA Partners name on a $7 million proposal from Walsh Bishop.  Id. ¶ 28.  Defendants submitted a proposal from Walsh Bishop to a different client with the name WBA Partners on the fee schedule.  Id. ¶ 29.

In August 2011, Scott sent the Walsh Bishop customer list to his personal email address, and Serrano sent a drawing he prepared for Walsh Bishop to his personal email address.  Id. ¶ 43.  During this time, defendants were meeting with competing firms, Welsh Companies and DLR Group,[1] about leaving Walsh Bishop and bringing its clients with them.  Thereafter, defendants' employment with Walsh Bishop terminated at an unknown date.

---

[1] Welsh Companies and DLR Group were not named as defendants in the present action.

Walsh Bishop sued defendants, claiming violation of the Computer Fraud and Abuse Act (CFAA), the Electronic Communications Privacy Act (ECPA) and the Lanham Act. Walsh Bishop also seeks injunctive relief and claims trade secret misappropriation in violation of the Minnesota Uniform Trade Secrets Act, violation of the Minnesota Deceptive Trade Practices Act, unfair competition, tortious interference with prospective economic advantage, tortious interference with prospective contracts, breach of the duty of loyalty, usurpation of corporate opportunities, civil conspiracy, common law trade name infringement and unjust enrichment. Defendants move to dismiss the CFAA, ECPA and Lanham Act claims for failure to state a claim.

## DISCUSSION

### I.    Rule 12(b)(6) Standard

To survive a motion to dismiss for failure to state a claim, "'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009) (quoting Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)). "A claim has facial plausibility when the plaintiff [has pleaded] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949 (citing Bell Atl. Corp. v. Twombly, 550

3

U.S. 544, 556 (2007)).   Although a complaint need not contain detailed factual allegations, it must raise a right to relief above the speculative level.   See Twombly, 550 U.S. at 555.   "[L]abels and conclusions or a formulaic recitation of the elements of a cause of action are not sufficient to state a claim."   Iqbal, 129 S. Ct. at 1949 (citation and internal quotation marks omitted).

## II.  CFAA

The CFAA subjects a person who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains ... information from a protected computer" to imprisonment and a fine.   18 U.S.C. § 1030(a)(2)(C), (c).   A protected computer is any computer used in or affecting interstate commerce.   Id. § 1030(e)(2)(B).   Congress provides a civil cause of action under the CFAA in certain circumstances.[2]   Id. § 1030(g). Congress does not define "without authorization" but defined "exceeds authorized access" to mean "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or

---

[2] The court notes that cases in this district have held that subsection (g) limits civil actions under the CFAA to violations of subsection (a)(5).   See, e.g., Hot Stuff Foods, LLC v. Dornbach, 726 F. Supp. 2d 1038, 1045 (D. Minn. 2010); Cenveo Corp. v. Celumsolutions Software GMBH & Co. KG, 504 F. Supp. 2d 574, 580 (D. Minn. 2007).   As the court stated in Hot Stuff, several other circuit courts have found that the CFAA authorizes civil actions beyond subsection (a)(5).   The court need not resolve this issue, however, because Walsh Bishop fails to state a claim under subsection (a)(2).

alter." Id. § 1030(e)(6). Walsh Bishop argues that a person exceeds authorized access by accessing information in order to use it in a manner contrary to an employer's interests and use policies. Defendants argue that they did not violate the CFAA because Walsh Bishop authorized their computer access "at the highest levels."

The Eighth Circuit has not determined whether the CFAA imposes civil liability on employees who access information with permission but with an improper purpose. Courts to consider the issue reach different conclusions. See Condux Int'l, Inc. v. Haugum, No. 08-4824, 2008 WL 5244818, at *4 & nn.3-4 (D. Minn. Dec. 15, 2008) (collecting cases). On one side, courts find that employees who use information contrary to an employer's policies or against an employer's interests exceed authorized access. See, e.g., United States v. Nosal, 642 F.3d 781, 788 (9th Cir. 2011), reh'g en banc granted, No. 10-10038, 2011 WL 5109831 (9th Cir. Oct. 27, 2011). Other courts, including those in this district, adopt a more narrow view and focus on the scope of access rather than misuse or misappropriation of information. See Xcedex, Inc. v. VMware, Inc., No. 10-3589, 2011 WL 2600688, at *4 (D. Minn. June 8, 2011), adopted by 2011 WL 2581754, at *1 (D. Minn. June 30, 2011); Condux, 2008 WL 5244818, at *4-6. But see Personalized Brokerage Servs., LLC v. Lucius, No. 05-1663, 2006 WL 208781, at *2 (D. Minn. Jan. 26, 2006) (finding subject-matter jurisdiction over a CFAA claim in

action involving information taken contrary to employer's interests). The court finds that Xcedex and Condux correctly apply the language and purpose of the statute.

The court interprets statutes to give effect to the intent of Congress. United States v. McAllister, 225 F.3d 982, 986 (8th Cir. 2000). The "starting point in interpreting a statute is always the language of the statute itself." Id. Thus where the plain language of a statute is unambiguous, the inquiry ends and that language is conclusive absent clear intent to the contrary. Id. If the language is ambiguous, the court considers "the purpose, the subject matter and the condition of affairs which led to its enactment" and gives the statute a "sensible construction ... to effectuate the underlying purposes of the law." Id. (citation and internal quotation marks omitted).

The language of § 1030(a)(2) does not support the interpretation of Walsh Bishop. Instead, Walsh Bishop's interpretation requires the court to rewrite the statute to replace the phrase "to use such access to obtain or alter information that the accesser is not entitled so to obtain or alter" with "to use such information in a manner that the accesser is not entitled so to use." But subsection (a)(2) is not based on use of information; it concerns access. Indeed, the language of subsection (a)(1) shows that Congress knows how to target the use of information when it intends to do so. See id. § 1030(a)(1) ("Whoever having

6

knowingly accessed a computer without authorization or exceeding authorized access, and by means of such conduct having obtained information ... causes to be communicated, delivered, or transmitted ... to any person not entitled to receive it...."); Condex, 2008 WL 5244818, at *5.

Further, the legislative purpose and history supports the plain meaning of the statute. Congress enacted the CFAA to deter "the criminal element from abusing computer technology in future frauds." H.R. Rep. No. 98-894, at 4 (1984), reprinted in 1984 U.S.C.C.A.N. 3689, 3690. As originally enacted, the CFAA applied to a person who (1) knowingly accessed without authorization or (2) "having accessed a computer with authorization, uses the opportunity such access provides for purposes to which such authorization does not extend." Pub. L. No. 98-473, § 2102, 98 Stat. 2190, 2190-91 (1984). Congress amended the statute by replacing the latter means of access with the phrase "exceeds authorized access." See Pub. L. No. 99-474, § 2, 100 Stat. 1213, 1213 (1986). The stated reason for the amendment was to "eliminate coverage for authorized access that aims at purposes to which such authorization does not extend." See S. Rep. No. 99-432, at 21 (1986), reprinted in 1986 U.S.C.C.A.N. 2479, 2495 (internal quotation marks omitted). As a result, Congress amended the statute to remove use as a basis for exceeding authorization.

No language or history concerning the CFAA suggests that Congress intended to provide a federal cause of action for state-law breach of contract, fiduciary duty, trade secret or other business-tort claims.  Therefore, the court rejects the interpretation of Walsh Bishop, and considers whether defendants accessed information that they were forbidden to access.[3]

Walsh Bishop argues that its computer-use policy restricted defendants' use of access and made their acts unlawful.  The court disagrees.  As an initial matter, Walsh Bishop did not attach the computer-use policy in its complaint.  Instead, it filed it with its memorandum in opposition to the present motion.  See Weiss Decl. Ex. A.  When addressing a Rule 12(b)(6) motion, the court does not consider matters outside the pleadings unless they do not contradict the complaint or are necessarily embraced by the complaint.

In the present action, the court does not consider the computer-use policy because the complaint does not mention the policy or its limitations.  Moreover, Walsh Bishop seeks to introduce the policy to contradict its complaint.  The complaint states:

---

[3] Moreover, if the interpretation of Walsh Bishop were plausible, the court would apply the rule of lenity and adopt the more narrow reading.  Leocal v. Ashcroft, 543 U.S. 1, 12 n.8 (2004) ("Because we must interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context, the rule of lenity applies.").

By virtue of their positions as officers and Executive committee members, O'Brien, Scott, and Serrano were given access to the highest level of WBA's confidential and proprietary information, including but not limited to names and contact information for existing and potential customers, WBA and customer financial information, the names and contact information for prospective customers, the types of services customers need, pricing and fee information, design proposals and concepts, and [Walsh Bishop's] procedures and techniques for selling to and servicing its customers and prospects.

Compl. ¶ 23; see also id. ¶ 15 ("access to the highest level of confidential and proprietary information"). Indeed, Walsh Bishop alleges that Scott created the list. Id. ¶ 43. In contrast, Walsh Bishop now argues that the computer-use policy limited the scope of access described in the complaint. As a result, the court does not consider the policy because it is not embraced by the complaint, and it contradicts the complaint.

Moreover, the claim fails even if the court were to consider the computer-use policy. The court has already determined that subsection (a)(2) of the CFAA applies to access rather than use. The instant computer-use policy proscribes certain uses of information,[4] not defendants' scope of access. Walsh Bishop

---

[4] Specifically, the policy defines inappropriate use as: "Revealing or publicizing proprietary, confidential or private information ... Sending (upload) or receiving (download) copyrighted materials, trade secrets, proprietary information or similar materials without prior authorization ... making unauthorized use of the intellectual property or proprietary data of ours or others." See Weiss Decl. Ex. A, at 39.

granted defendants broad access to its computer systems, and expressly granted access to the areas of the system that it alleges defendants used with an improper purpose. As a result, even including the computer-use policy, Walsh Bishop fails to allege facts from which the court could infer a plausible claim for violation of the CFAA. Therefore, dismissal is warranted.

## III.  ECPA

The ECPA applies to facilities in "which an electronic communication service is provided" and makes it unlawful to "intentionally access without authorization" or "intentionally exceed[] an authorization to access" and thereby "obtain[], alter[], or prevent[] authorized access to a wire or electronic communication while it is in electronic storage in such system." 18 U.S.C. § 2701(a). An electronic communication service "means any service which provides users thereof the ability to send or receive wire or electronic communications." Id. § 2510(15). Courts interpret the ECPA to encompass internet service providers and telecommunications companies. See, e.g., Dyer v. Nw. Airlines Corps., 334 F. Supp. 2d 1196, 1198–99 (D.N.D. 2004) (addressing claim under § 2702 and collecting cases discussing ECPA definition of electronic communication service). Walsh Bishop argues that defendants violated the ECPA when they "intentionally accessed

[Walsh Bishop's] company database for an unauthorized purpose." Compl. ¶ 52. Defendants respond that Walsh Bishop had granted them the "highest access" to its computer systems.

As an initial matter, the court notes that this claim fails because Walsh Bishop is not a provider of "electronic communication service" as defined by the ECPA. Moreover, the court has already determined that defendants did not act without authorization or in excess of authorization for purposes of the CFAA. Nothing in the language of the ECPA suggests a different outcome. Like the CFAA, the purpose of the ECFA is not to provide a federal cause of action in employment disputes traditionally governed by state law. Instead, Congress enacted the ECPA to "update[] existing Federal wiretapping law" following the advent of cellular telephones and electronic mail. 132 Cong. Rec. 28129–30 (1986) (statement of Rep. Kastenmeier); see id. at 27633, 27634 (statement of Sen. Leahy). Therefore, dismissal of the ECPA claim is warranted.

**IV. Lanham Act**

**A.   Trademark[5] Infringement**

To state a trademark-infringement claim, a plaintiff must plead facts from which the court can draw the reasonable inference that it possesses a valid, protectible mark and that use of a

---

[5] It appears that the marks at issue are service marks. However, the court follows the terminology used by the parties, because the distinction has no effect on the disposition of the present motion.

similar mark by a defendant is likely to create confusion as to the origin of the service. See 15 U.S.C. § 1125(a)(1); Everest Capital Ltd. v. Everest Funds Mgmt., L.L.C., 393 F.3d 755, 759 (8th Cir. 2005).

### 1. Protectible Interest in Mark

The marks in this action are not registered with the United States Patent and Trademark Office, and Walsh Bishop bears the burden to establish that they are protectible trademarks. See Frosty Treats Inc. v. Sony Computer Entm't Am. Inc., 426 F.3d 1001, 1003 (8th Cir. 2005). The court categorizes marks into four categories: "(1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful." Id. at 1004-05. These categories have specific meanings:

> A generic mark refers to the common name or nature of an article, and is therefore not entitled to trademark protection. A term is descriptive if it conveys an immediate idea of the ingredients, qualities or characteristics of the goods, and is protectible only if shown to have acquired a secondary meaning. Suggestive marks, which require imagination, thought, and perception to reach a conclusion as to the nature of the goods, and arbitrary or fanciful marks, are entitled to protection regardless of whether they have acquired secondary meaning.

Id. at 1005. Marks that are primarily surnames "constitute a specific subcategory of descriptive marks, in that they describe

the fact that the named individual is affiliated with the firm." Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc., 192 F.3d 337, 345 (2d Cir. 1999) (citations omitted).

According to Walsh Bishop, the mark "WBA" is an acronym for Walsh Bishop Associates.  Defendants argue that WBA is a generic mark because Walsh Bishop failed to plead facts from which the court could infer that the mark is distinctive.  In further support, defendants argue that WBA is an acronym used by many entities including the World Boxing Association, the Women's Basketball Association,[6] the Wisconsin Banker's Association, the Wisconsin Builder's Association, the Wisconsin Broadcaster's Association and the World Backgammon Association.[7]  Walsh Bishop responds that WBA cannot be generic because it is not the common name for an article or service.  The court agrees.

When, as here, a mark is an acronym, the court treats it similarly to the underlying terms for which it stands, unless

_____

[6] Defendants appear to confuse the Women's National Basketball Association (WNBA) with the World Basketball Association (WBA).

[7] Indeed, a search for "WBA" and "architects" on the internet reveals several architectural firms that use "WBA" as a mark: Wisnewski Blair & Associates (www.wba-arch.com), Williams Blackstock Architects (www.wba-architects.com), Wakefield Beasley & Associates (www.wbaassociates.com) and The WBA Group, Inc. (www.the-wba-group.com).  It is notable that Walsh Bishop is not one such firm.  See Gen. Mills, Inc. v. Kellogg Co., 824 F.2d 622, 626-27 (8th Cir. 1987) ("[E]vidence of third party usage of similar marks on similar goods is admissible and relevant to show that the mark is relatively weak and entitled to a narrower scope of protection.").  The court does not rely on this fact in its decision.

imagination is required to connect the acronym with the service. Anheuser-Busch Inc. v. Stroh Brewery Co., 750 F.2d 631, 635–36 (8th Cir. 1984); accord Nat'l Conference of Bar Exam'rs v. Multistate Legal Studies, Inc., 692 F.2d 478, 488 (7th Cir. 1982). According to Walsh Bishop, it uses the WBA acronym in "business communications." Such use requires no imagination by clients to connect it with Walsh Bishop and its services. Thus, the court examines underlying mark, Walsh Bishop Associates. Walsh and Bishop are surnames of founding members of the firm; as such they are descriptive. Associates is a generic term. Read as a whole, Walsh Bishop Associates and WBA are, at best, descriptive marks, subject to protection only if they have acquired secondary meaning. See Everest Capital, 393 F.3d at 761 (citations omitted) (viewing mark in its complete form rather than dissecting component parts).

A mark carries secondary meaning when "by long and exclusive use in the sale of the goods or services, the mark has become so associated in the public mind with such goods or services that the mark serves to identify the source of the goods and to distinguish them from those of others." Heartland Bank v. Heartland Home Fin., Inc., 335 F.3d 810, 818–19 (8th Cir. 2003). Secondary meaning may be proven by direct evidence in the form of consumer surveys and testimony of customers or inferred through indirect evidence. Id. at 819. Secondary meaning may also be proven through "reasonable inferences from the evidence of money spent in advertising to

establish that the mark is from a particular source, of the type of advertising used, of long-term usage of the mark, and of sales volume." Id.  In short, Walsh Bishop must plead facts allowing a reasonable inference that "through long and exclusive use and advertising" its marks have "become so associated in the public mind" with its services.  Id. at 819.

Walsh Bishop offers only conclusory statements that its marks "have come to be understood by customers and the public" because of its "long, continuous, and exclusive use of its trade names."  Such conclusory statements and rote recitations of elements are not sufficient to state a claim based on secondary meaning.  Beyond reciting the elements of the analysis and stating that it has existed for twenty-seven years, Walsh Bishop fails to present facts from which the court could draw an inference that its marks, particularly WBA, have acquired secondary meaning.  As a result, Walsh Bishop has not pleaded facts sufficient to infer that it has a protectible interest in the WBA mark, and therefore, dismissal of the trademark-infringement claim is warranted on this basis alone.[8]

## 2.  Likelihood of Confusion

Further, even if Walsh Bishop had pleaded facts sufficient to show that Walsh Bishop Associates and WBA had developed secondary meaning, it did not plead facts sufficient to show a likelihood of

---

[8] The court also notes that other than stating that it uses the WBA mark in "business communications," there are no facts that suggest that Walsh Bishop even uses the WBA mark.

confusion.  As an initial matter, the court notes that defendants allegedly used the name WBA Partners, Inc. in Walsh Bishop communications and services while they were employees of Walsh Bishop.  Such use cannot confuse clients into thinking that the service to which the mark WBA Partners, Inc. was attached was instead provided by anyone other than Walsh Bishop: it was provided by Walsh Bishop.  The complaint does not suggest that defendants used the mark WBA Partners, Inc. in any capacity other than while actually providing the services of Walsh Bishop or that defendants used WBA Partners, Inc. after leaving Walsh Bishop.

Moreover, if the court could infer that confusion were even possible, Walsh Bishop fails to plead facts sufficient to show a likelihood of confusion.  The court applies the following non-exclusive factors to assess whether a likelihood of confusion exists:

> (1) the strength of the owner's mark; (2) the similarity of the owner's mark and the alleged infringer's mark; (3) the degree of competition between the products; (4) the alleged infringer's intent to 'pass off' its goods as the trademark owner's; (5) incidents of actual confusion; and, (6) the type of product, its cost, and conditions of purchase.

Everest Capital, 393 F.3d at 759-60 (citations omitted).  No single factor is dispositive.  Sensient Tech. Corp. v. SensoryEffects Flavor Co., 613 F.3d 754, 763 (8th Cir. 2010).

16

### a.   Strength of Mark

Assuming that Walsh Bishop uses the WBA mark in commerce, the court has already determined that Walsh Bishop Associates and WBA are, at best, descriptive and that Walsh Bishop has not pleaded facts from which the court could infer that WBA has acquired secondary meaning. See id. at 763–74 (explaining that strong marks are entitled to greater protection). As a result, this factor weighs against a likelihood of confusion.

### b.   Similarity of Marks

The court considers the similarity between the WBA and WBA Partners, Inc. marks by evaluating "the impression that each mark in its entirety is likely to have on a purchaser exercising the attention usually given by purchasers of such products." Sensient, 613 F.3d at 764. "The use of identical, even dominant, words in common does not automatically mean that two marks are similar." Gen. Mills, 824 F.2d at 627. Here, although the marks share the letters "WBA" it is evident that WBA Partners, Inc. is different from WBA, based on sound and length of mark. The difference in the marks is enhanced because the service is offered to sophisticated purchasers of large-scale commercial architecture. As a result, this factor weighs against a likelihood of confusion.

### c.   Degree of Competition

Walsh Bishop has pleaded facts from which the court could infer that it offers commercial architectural services, both

regionally and nationally, and that defendants intend to offer the same type of services.  As a result, this factor weighs in favor of a likelihood of confusion.

### d.    Intent of Alleged Infringers

It is evident that defendants' choice of the name WBA Partners, Inc. is not fortuitous.  Instead, Walsh Bishop has pleaded facts from which the court could infer that defendants engaged in a deliberate attempt to mimic Walsh Bishop and co-opt its good will.  As a result, this factor weighs in favor of a likelihood of confusion.

### e.    Type of Product, Cost and Conditions of Purchase

Walsh Bishop provides architectural services to sophisticated corporate and hospitality-industry clients.  The relationship with casino and hotel clients spans more than a year and the large projects can cost more than $100 million.  Such sophisticated clients are not likely to be confused about the source and identity of the provider of services when they are poised to invest large sums of capital in long-term relationships.  As a result, this factor weighs against a likelihood of confusion.

Viewing the facts pleaded and inferences in the light most favorable to Walsh Bishop, and following consideration of the factors, the court determines that Walsh Bishop has failed to state facts from which the court could draw a reasonable inference of a likelihood of confusion between the marks WBA and WBA Partners,

18

Inc.  Therefore, dismissal of the trademark-infringement claim is warranted for this additional reason.

### B.  Passing Off

To state a passing-off claim, a plaintiff must plead facts from which the court can infer that a defendant has sold "goods or services under the pretense that they are the goods or services of another." DaimlerChrysler AG v. Bloom, 315 F.3d 932, 937 (8th Cir. 2003).  Reverse passing off occurs when a defendant removes a plaintiff's marks before reselling goods.  Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc., 35 F.3d 1226, 1241 (8th Cir. 1994).  In the present action, the court cannot infer a passing-off claim — or the equivalent of a reverse passing-off claim — from the facts in the complaint.  The court has already determined that Walsh Bishop failed to show that the WBA mark is distinctive or that it has acquired secondary meaning.  As a result, this claim fails.

Moreover, plaintiffs fail to identify any service provided by WBA Partners under false pretenses.  While working for Walsh Bishop, defendants provided the services of Walsh Bishop to Walsh Bishop clients.  Walsh Bishop does not allege that defendants used the WBA Partners, Inc. mark to market, communicate or advertise any service after leaving Walsh Bishop.  As a result, there are no facts that suggest any use in commerce in which services that were not those of Walsh Bishop were presented in a manner as to cause confusion as to their source.  Nor do any facts suggest that

defendants re-labeled services of Walsh Bishop as services of WBA Partners.   Therefore, dismissal of the passing-off claim is warranted.

**V.   State-Law Claims**

When the court dismisses the federal claims, and there is no basis for diversity jurisdiction, the court no longer has original jurisdiction over the action and must consider whether to exercise supplemental jurisdiction over the state-law claims.   See 28 U.S.C. § 1367(c)(3); Johnson v. City of Shorewood, 360 F.3d 810, 819 (8th Cir. 2004). "In the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine [— judicial economy, convenience, fairness and comity —] will point toward declining to exercise jurisdiction over the remaining state-law claims." Id. (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)).

In the present case, the factors weigh in favor of dismissal of the state-law claims.   Although the court expresses no opinion upon the merits of Walsh Bishop's remaining claims, the court notes that they involve numerous, serious allegations of violations of Minnesota statutory and common law for which defendants and others may be liable to Walsh Bishop.   Therefore, dismissal of the state-law claims without prejudice is warranted so that Walsh Bishop can bring an action against defendants in Minnesota state court.

**CONCLUSION**

Accordingly, based on the above, **IT IS HEREBY ORDERED** that:

1.    The Motion to Dismiss [ECF 7] is granted;

2.    The Lanham Act, CFAA and ECFA claims are dismissed; and

3.    The remaining claims are dismissed without prejudice to refiling in state court.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  February 28, 2012

                                        s/David S. Doty                  
                                        David S. Doty, Judge
                                        United States District Court